# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE,      )
                         )
                         )
    **v.**                  )      **I.D. No. 1804000397**
                         )
                         )      **Cr. A. Nos.  IN18-04-0406 – 0411,**
**CHAON CALHOUN,**      )         **and IN18-07-1843 – 1845.**
         **Defendant.** )

Submitted:  October 23, 2023
Decided:  January 23, 2024

## MEMORANDUM OPINION AND ORDER

*Upon Defendant Chaon Calhoun's Motion for Postconviction Relief*,
**DENIED**.

Brian L. Arban, Esquire, Deputy Attorney General, DEPARTMENT OF JUSTICE, Wilmington, Delaware, for the State of Delaware.

Herbert W. Mondros, Esquire, RIGRODSKY LAW, P.A., Wilmington Delaware, Karl Schwartz, Esquire, Catherine Trama, Esquire, WISEMAN & SCHWARTZ, Philadelphia, Pennsylvania, for Chaon Calhoun.

**WALLACE, J.**

On Easter Sunday 2018, Chaon Calhoun—who had a history of drug use and mental health issues that had troubled him and his family for more than a decade—went on a violent rampage at his mother's home. In the end, one innocent person was dead, a toddler suffered life-threatening injuries, and two others had been stabbed or sliced to varying degrees.

The trial for the Easter events was conducted before the Court without a jury. There was little contention over what happened and whether Mr. Calhoun had engaged in the brutality. But the parties hotly contested what spurred Mr. Calhoun to act as he did that night. As submitted to the Court for verdict, the questions were: (1) which offense fit the injury to each victim; and, (2) whether Mr. Calhoun could be held criminally responsible for them. The Court entered a verdict of guilty but mentally ill as to each conviction attained and later sentenced Mr. Calhoun accordingly.

His convictions and sentence having been affirmed on direct appeal, Mr. Calhoun has returned here seeking postconviction relief under this Court's Criminal Rule 61. According to Mr. Calhoun, his trial counsel was ineffective in her presentation of his insanity defense. She was not. And, for the reasons now explained, Mr. Calhoun is due no postconviction relief.

# I. FACTUAL AND PROCEDURAL BACKGROUND

## A. THE TRAGEDY ON EASTER SUNDAY 2018.

Mr. Calhoun was staying temporarily at his mother Wanda Berry's home on April 1, 2018.[1] Living there too was Connie Saunders and her eighteen-month-old child, who was Mr. Calhoun's niece.[2] On that Easter Sunday, Ms. Saunders had invited a friend, Andrew Moore, over to the house as well.[3]

After the three had been out earlier visiting family and friends, Mr. Moore and the baby were watching movies with Ms. Saunders in her bedroom at the Berry home.[4] Mr. Calhoun came into the bedroom unexpectedly and told Ms. Saunders that he wanted to keep her child safe by giving Ms. Saunders a knife for protection.[5] He then left the bedroom to look for a knife.[6] Fearful of Mr. Calhoun's strange behavior, Mr. Moore closed and locked the bedroom door behind him.[7]

Mr. Calhoun came back with a knife in hand.[8] Realizing the door was locked, Mr. Calhoun started to break it open while Mr. Moore tried to barricade it.[9] Upon

---

[1]  D.I. 49 ("Sept. 9, 2019 Trial Tr.") at 28-30.

[2]  *Id*. at 26-28, 40.

[3]  *Id*. at 30-32.

[4]  *Id*. at 32.

[5]  *Id*. at 33.

[6]  *Id*. at 34.

[7]  *Id*.

[8]  *Id*. at 35.

[9]  *Id*.

gaining partial entry, Mr. Calhoun offered to give Ms. Saunders the knife. She told him to leave it in the hallway.[10] Mr. Calhoun responded that Ms. Saunders was "alright," but that Mr. Moore had to die.[11] He then broke the rest of the way in and stabbed Mr. Moore repeatedly.[12] At some point, Mr. Calhoun also stabbed Ms. Saunders and the baby.[13] Ms. Saunders escaped with her daughter through a back door and flagged down a car that took them to a hospital.[14]

Ms. Berry had been outside of the house when the violence began but ran inside when she heard yelling from the bedroom.[15] She saw what was happening and implored Mr. Calhoun to stop.[16] She, too, was stabbed in that exchange.[17] Eventually, Mr. Moore was able to wrestle the knife away from Mr. Calhoun.[18]

The police arrived soon thereafter, finding Ms. Berry on the front porch, Mr. Moore near the doorway, and Mr. Calhoun in the living room.[19] According to

---

[10]   *Id*. at 35-36.

[11]   *Id*.

[12]   *Id*. at 36-37.

[13]   *Id*.

[14]   *Id*. at 37-38.

[15]   *Id*. at 126.

[16]   *Id*. at 127.

[17]   *Id*. at 128.

[18]   *Id*. at 129. Mr. Moore later died from his injuries.

[19]   *Id*. at 138.

police testimony, Mr. Calhoun appeared to be intoxicated and out of sorts.[20] Among other things, Mr. Calhoun told police that there were people "teleporting" around the room.[21]

Mr. Calhoun was taken to a local hospital to receive treatment for an injury to his hand.[22]  At the hospital, Mr. Calhoun said that everyone was dead because PCP was draining out of his body,[23] that he killed his own family for PCP, and that he deserved to die.[24]

## B. THE TRIAL TESTIMONY KEY TO THE PRESENT CHALLENGE

During Mr. Calhoun's six-day bench trial,[25] the State presented numerous witnesses, including police officers, Ms. Saunders, Ms. Berry, and others.  The defense focused on Mr. Calhoun's claims of mental illness, particularly his increasingly erratic behavior just before Easter.  In short, the parties disagreed on what part Mr. Calhoun's regular PCP use and purported mental illness played in his crimes.

---

[20]  *Id*. at 71, 99, 140.

[21]  *Id*. at 106.

[22]  *Id*. at 99.

[23]  "PCP" is short for phencyclidine.  Blood tests revealed that Mr. Calhoun did have some amount of that drug remaining in his system at the time of the crimes. D.I. 53 ("Sept. 10, 2019 Trial Tr.") at 153-77.

[24]  Sept. 9, 2019 Trial Tr. at 102.

[25]  Mr. Calhoun's trial took place in September 2019, after he had rejected a plea offer and waived his right to a jury trial. D.I. 28, 30-31.  Mr. Calhoun stipulated that he was a person prohibited and pursued the affirmative defense to all charges of not guilty by reason of insanity. D.I. 38.

The Court need not further reconstitute the entirety of the detailed factual background and trial proceedings here; the parties and Court are well-acquainted with the record to this point.[26] That said, a brief recounting of three witnesses key to the present claim is helpful.

Ms. Berry explained that her son had been living with his girlfriend, Brittney Hannah, at the time of the incident.[27] According to Ms. Berry, Mr. Calhoun had been acting strangely in the days leading up to Easter, exhibiting paranoia and making statements about how he believed Brittany was trying to kill him.[28] Ms. Berry decided to let him stay at her home so that she could try to get him medical help.[29]

Forensic and Clinical Psychologist Robert Thompson was called as the defense expert witness in support of Mr. Calhoun's Not Guilty by Reason of Insanity ("NGRI") defense.[30] Dr. Thompson evaluated Mr. Calhoun following the crimes

---

[26] *See, e.g., Calhoun v. State*, 2020 WL 5951370, at *1-3 (Del. Oct. 7, 2020) (direct appeal decision recounting the crimes and trial); First Amended Motion for Relief and Consolidated Brief In Support ("Am. Mot. for Postconviction Relief"), at 5-33 (D.I. 78) (same); State's Rule 61 Resp., at 1-8, 13-38 (D.I. 84) (same).

[27] Sept. 9, 2019 Trial Tr. at 118-119.

[28] *Id*. at 120-121.

[29] *Id*.

[30] Under Section 401(a) of Title 11: "In any prosecution for an offense, it is an affirmative defense that, at the time of the conduct charged, as a result of mental illness or serious mental disorder, the accused lacked substantial capacity to appreciate the wrongfulness of the accused's conduct. If the defendant prevails in establishing the affirmative defense provided in this subsection, the trier of fact shall return a verdict of 'not guilty by reason of insanity.'" DEL. CODE ANN. tit. 11, § 401(a) (2017).

-6-

and prepared an extensive report on his competency and mental state when the crimes occurred.[31] Per Dr. Thompson's report, Mr. Calhoun was diagnosed with Attention Deficit Hyperactivity Disorder as a child and had taken medication for that disorder, but he hadn't received mental health care as an adult until his incarceration.[32] Dr. Thompson diagnosed Mr. Calhoun with, *inter alia*, unspecified schizophrenia spectrum and other psychotic disorders.[33]

Dr. Thompson's report detailed Mr. Calhoun's version of events leading up to the stabbings.[34] The report recounted Mr. Calhoun's psychotic incident with Brittany Hannah at a bus stop the day before, when Mr. Calhoun believed his life was in danger.[35] Additionally, the report included Dr. Thompson's interview with

---

[31] D.I. 44 ("Sept. 16, 2019 Trial Tr.") at 4; Am. Mot. for Postconviction Relief Appendix ("PCR Appendix") at A-001 ("Thompson Report") (D.I. 80).

[32] Thompson Report at 3.

[33] *Id*. at 6.

[34] *Id*. at 10-13.

[35] *Id*. at 11-12:

> On Saturday, March 31st, Mr. Calhoun started experiencing increased "paranoia." He came to feel that Brittany was trying to have him "set up" and "murdered." He recalled having that experience one or two times previously, although it had been relatively short-lived. He perceived Brittany to be "acting sluggish." He felt that "something's not right." He indicated that the two of them got on a bus that day. He recalled seeing the driver of the bus another day, and the two of them had discussed truck driving. During the trip, the driver missed a stop; he had to go off-route due to construction. Mr. Calhoun "felt uneasy," as if something bad was "going to happen." To him, "nothing seemed right." He saw a young man at a bus stop. He had the feeling that he was being "set up" in some way. He developed ideas of reference, believing that ladies where were standing on a corner were looking at him. He remembered feeling "real weird." As his feelings increased, he began to feel panicky. He felt the urge to get off the bus immediately. Britany argued with him, tried to talk him into not getting off the bus. But he got off

Ms. Berry, who also recalled the bus incident.[36]

During his trial testimony, Dr. Thompson opined that Mr. Calhoun lacked the substantial capacity to appreciate the wrongfulness of his conduct at the time of the crimes.[37] He agreed, too, that Mr. Calhoun suffered from a mental illness that sufficiently disturbed his thinking, feeling, or behavior, or that left him with insufficient willpower to choose whether to commit or refrain from committing the crimes.[38]

Dr. Thompson explained that Mr. Calhoun has a history of drug use and frequently used PCP and marijuana.[39] Yet, the psychologist opined that Mr. Calhoun was not voluntarily under the influence of PCP or suffering PCP-induced psychosis when the crimes occurred.[40] Dr. Thompson based this opinion on what he viewed as insufficient evidence of Mr. Calhoun's most recent PCP use[41] and also,

anyway, leaving her on the bus alone at Rodney Square. He started to walk to his apartment. While he was walking, he saw police officers and "tried to get a ride to the hospital," but they said no. They told him they were unable to provide a ride to the hospital.

[36] *Id*. at 13 ("[Ms. Berry] indicated that, on Saturday, something happened while Mr. Calhoun and his girlfriend, Brittany Hannah, were riding a bus. Apparently, Mr. Calhoun was 'acting strange' on the bus. This information was reported by Mr. Calhoun's girlfriend to Ms. Berry.")

[37] Sept. 16, 2019 Trial Tr. at 63-65.

[38] *Id*.

[39] *Id*. at 30-32.

[40] *Id*. at 33-35.

[41] *Id*. at 65. At trial, the State contended that Mr. Calhoun used PCP sometime just prior to the incident. Sept. 9, 2019 Trial Tr. at 9-11. But Mr. Calhoun told Dr. Thompson that he last used PCP five days before the incident occurred. Thompson Report at 11.

importantly, because Mr. Calhoun continued to exude psychotic disorder behaviors while imprisoned—well after his PCP usage had stopped.[42]  Dr. Thompson's conclusions regarding Mr. Calhoun's capacity to appreciate the wrongfulness of his acts were unaffected by Mr. Calhoun's immediate remorseful statements to police officers at the hospital.  Because, said Dr. Thompson, a psychotic person could still express remorse.[43]

On cross-examination, the State asked Dr. Thompson about not having received certain police reports prior to authoring his pretrial report.[44]  Dr. Thompson confirmed that he was aware of Mr. Calhoun's statements to police, but that he "still believe[d] there was sufficient information to form an opinion."[45]  On redirect, Dr. Thompson confirmed that he knew about Mr. Calhoun's various statements to others, that he had received copies of law enforcement's recorded interviews with Ms. Saunders and Ms. Berry after he completed his report but prior to trial, and that he had reviewed witness statements before last meeting with Mr. Calhoun and testifying at trial.[46]

The State called Clinical and Forensic Psychiatrist Stephen Mechanick as its

---

[42]  Sept. 16, 2019 Trial Tr. at 96-98; D.I. 45 ("Sept. 17, 2019 Trial Tr.") at 227.

[43]  *See id*. at 221.

[44]  Sept. 16, 2019 Trial Tr. at 81-83.

[45]  *Id*. at 81.

[46]  *Id.* at 137-139, 142-144, 150-154, 162-164, 179-180.

rebuttal expert witness. According to Dr. Mechanick, there was insufficient evidence that Mr. Calhoun suffered from a mental disorder that could cause psychotic symptoms.[47] Instead, Dr. Mechanick opined, Mr. Calhoun's behavior at the time of the crimes was explained by PCP intoxication.[48] Dr. Mechanick posited that Mr. Calhoun was under the influence of PCP when the incident occurred and explained that side effects of PCP use can include paranoia and aggression.[49] Dr. Mechanick also opined that Mr. Calhoun showed an appreciation for the wrongfulness of his actions based, in part, on his remorseful statements after the incident.[50]

## C. THE VERDICT AND APPEAL

On September 20, 2019, the Court returned its verdict. Mr. Calhoun was found guilty but mentally ill ("GBMI")[51] of first-degree murder (Mr. Moore), attempted first-degree murder (the child), first-degree assault (Ms. Berry—as an

---

[47] Sept. 17, 2019 Trial Tr. at 16, 26-28.

[48] *Id*. at 37-40.

[49] *Id*.

[50] *Id* at 54-55.

[51] Under DEL. CODE ANN. tit. 11, § 401(b) (2017),

Where the trier of fact determines that, at the time of the conduct charged, a defendant suffered from a mental illness or serious mental disorder which substantially disturbed such person's thinking, feeling or behavior and/or that such mental illness or serious mental disorder left such person with insufficient will power to choose whether the person would do the act or refrain from doing it, although physically capable, the trier of fact shall return a verdict of "guilty, but mentally ill."

included offense of attempted first-degree murder), first-degree assault (Ms. Saunders), and the related weapons counts.[52] Mr. Calhoun was later sentenced cumulatively to two life terms plus 20 years and a 3-year imprisonment term suspended for decreasing levels of supervision.[53]

Mr. Calhoun appealed his convictions and sentence.[54] After his appellate counsel moved to withdraw her representation pursuant to Supreme Court Rule 26(c),[55] Mr. Calhoun exercised his right to raise certain points for the Supreme Court's consideration.[56] The Delaware Supreme Court affirmed the Court's judgment.[57]

Mr. Calhoun, invoking Superior Court Criminal Rule 61, then filed *pro se* motions for postconviction relief and appointment of counsel.[58] The Court appointed counsel who is prosecuting Mr. Calhoun's present amended postconviction motion.[59]

---

[52] D.I. 40.

[53] D.I. 43. He will serve that sentence under the conditions provided in 11 *Del. C.* § 408(b) and (c). *Id.*

[54] *Calhoun v. State*, 2020 WL 5951370 (Del. Oct. 7, 2020).

[55] *Id*. at *3 (citing Del. Supr. Ct. R. 26(c) ("If the trial attorney, after a conscientious examination of the record and the law, concludes that an appeal is wholly without merit, the attorney may file a motion to withdraw.")).

[56] *Id*.

[57] *Id.* at *7 ("This Court has reviewed the record carefully and has concluded that Calhoun's appeal is wholly without merit and devoid of any arguably appealable issue.").

[58] D.I. 57, 58.

[59] D.I. 61; D.I. 78.

## II. THE POSTCONVICTION MOTION

### A. MR. CALHOUN'S MOTION CAN BE CONSIDERED ON ITS MERITS.

Delaware courts must consider Criminal Rule 61's procedural requirements before addressing any substantive issues.[60] The Rule 61 procedural bars are "timeliness, repetitiveness, procedural default, and former adjudication."[61]

Less than a year after his judgment of conviction became final, Mr. Calhoun timely filed his Rule 61 motion.[62] This is his first postconviction motion, so it is not repetitive. As Mr. Calhoun's only claim for relief alleges ineffective assistance of counsel—which, except in the rarest of circumstances, cannot be raised on direct appeal—he is neither procedurally barred from raising it in this collateral proceeding, nor has it been formerly adjudicated.[63]

Accordingly, the Court will address the merits of Mr. Calhoun's postconviction claim.

### B. MR. CALHOUN'S POSTCONVICTION CLAIM OF INEFFECTIVENESS

Mr. Calhoun contends that the following "failure[s] by trial counsel" in executing his insanity defense constitute ineffective assistance violative of the Sixth

---

[60] *Maxion v. State*, 686 A.2d 148, 150 (Del. 1996); *State v. Jones*, 2002 WL 31028584, at *2 (Del. Super. Ct. Sept. 10, 2002).

[61] *State v. Stanford*, 2017 WL 2484588, at *2 (Del. Super. Ct. June 7, 2017) (citations omitted).

[62] *See* Super Ct. Crim. R. 61(i)(1) and (m)(2).

[63] *Stanford*, 2017 WL 2484588, at *3.

Amendment:

(1)     failure to elicit testimony supportive of Mr. Calhoun's insanity defense from state's witness Wanda Berry, and failure to ask Dr. Thompson to incorporate [Ms.] Berry's statements to police into his opinion, report, and testimony regarding Mr. Calhoun's mental state;[64]

(2)     failure to call Brittney Hannah as a defense witness, and failure to ask Dr. Thompson to incorporate [Ms.] Hannah's statement to police into his report and opinion regarding petitioner's mental state;[65]

(3)     failure to present a toxicology expert to disprove Mr. Calhoun's statement that he used "Wet" on the day of the stabbing;[66]

(4)     failure to provide DOC records supportive of Mr. Calhoun's insanity defense to Dr. Thompson before trial;[67] and,

(5)     failure to provide Dr. Thompson with any police reports related to Mr. Calhoun's case.[68]

In addition to pointing out what he deems these inexcusable individual defects in his trial defense, Mr. Calhoun says that the cumulative effect of two or more of the above-described alleged deficiencies should warrant relief.[69]

---

[64]   Am. Mot. for Postconviction Relief at 36-47.

[65]   *Id*. at 47-55.

[66]   *Id*. at 55-62.

[67]   *Id*. at 62-68.

[68]   *Id*. at 68-73.

[69]   *Id*. at 73-75.  Mr. Calhoun also includes a cursory prayer for discovery and an evidentiary hearing. *Id*. at 76.

-13-

### III.  APPLICABLE LEGAL STANDARDS

A movant who claims ineffective assistance of counsel must demonstrate that: (a) his defense counsel's representation fell below an objective standard of reasonableness, and (b) there is a reasonable probability that but for counsel's errors, the result of the proceeding would have been different.[70]

There is a strong presumption that a criminal defense counsel's representation was reasonable.[71]  When assessing the reasonableness of counsel's conduct, the Court considers "not what is possible or what is prudent or appropriate, but only what is constitutionally compelled."[72]  The "[b]enchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."[73]

Too, one claiming ineffective assistance "must make specific allegations of how defense counsel's conduct actually prejudiced the proceedings, rather than mere allegations of ineffectiveness."[74]

---

[70]  *Strickland v. Washington*, 466 U.S. 668, 694 (1984); *see also Alston v. State*, 2015 WL 5297709, at *2-3 (Del. Sept. 4, 2015).

[71]  *Green v. State*, 238 A.3d 160, 174 (Del. 2020) (quoting *Strickland*, 466 U.S. at 689)).

[72]  *Id.* (quoting *Burger v. Kemp*, 483 U.S. 776, 794 (1987)).

[73]  *Cooke v. State*, 977 A.2d 803, 840 (Del. 2009) (internal quotations omitted).

[74]  *Alston*, 2015 WL 5297709, at *3 (citing *Wright v. State*, 671 A.2d 1353, 1356 (Del. 1996)); *Monroe v. State*, 2015 WL 1407856, at *5 (Del. Mar. 25, 2015) (citing *Dawson v. State*, 673 A.2d 1186, 1196 (Del. 1996)).

Last, a movant must demonstrate *both* deficient attorney performance and resulting prejudice to succeed on his ineffective assistance of counsel claim.[75] Failure to do so on either will doom that claim and obviate any need for the Court to address the other.

## IV.  DISCUSSION

### *TRIAL COUNSEL'S PERFORMANCE WAS NOT OBJECTIVELY UNREASONABLE NOR IS THERE A REASONABLE PROBABILITY OF A DIFFERENT VERDICT*

### A.  TRIAL COUNSEL'S TACK ON CROSS-EXAMINATION OF MR. CALHOUN'S MOTHER WAS REASONABLE TRIAL STRATEGY.

Mr. Calhoun first contends that trial counsel should have cross-examined Ms. Berry in greater detail.[76] Specifically, Mr. Calhoun says that trial counsel should have asked Ms. Berry more about Mr. Calhoun's mental state leading up to the incident.[77] And Mr. Calhoun argues that Ms. Berry's knowledge of an incident that occurred some years earlier should have been inquired into.[78] According to Mr. Calhoun, cross-examination about these prior events would have further supported his NGRI defense.[79]

---

[75] *Strickland,* 466 U.S. at 694; *Ploof v. State*, 75 A.3d 811, 825 (Del. 2013) ("*Strickland* is a two-pronged test, and there is no need to examine whether an attorney performed deficiently if the deficiency did not prejudice the defendant." (citation omitted)); *State v. Hamby*, 2005 WL 914462, at *2 (Del. Super. Ct. Mar. 14, 2005).

[76] Am. Mot. for Postconviction Relief at 41-43.

[77] *Id*.

[78] *Id*. at 37-38, 41-42.

[79] *Id*. at 46-47.

Mr. Calhoun bears the burden of showing that his counsel's conduct fell below an objective standard of reasonableness, "*i.e.*, that no reasonable lawyer would have conducted the defense as his lawyer did."[80] "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."[81]

In her post-trial affidavit, trial counsel explained that Ms. Berry informed her "[Mr. Calhoun] had been hospitalized previously for PCP drug-induced psychosis because of his heavy and extended use (15+ years) of PCP."[82] Ms. Berry also told trial counsel that Mr. Calhoun "had been physically violent . . . following a diagnosis of PCP drug-induced psychosis," and that she "had been actively trying to get [Mr. Calhoun] into an in-patient drug rehabilitation program."[83]

Mr. Calhoun has not shown that trial counsel's examination of Ms. Berry was objectively unreasonable. A criminal defense attorney is given wide latitude in making strategic trial decisions; this extends to the conduct of cross-examination.[84] The questions to be asked and how a given cross-examination is conducted are

---

[80] *Green*, 238 A.3d at 174 (citing *Burger*, 483 U.S. at 791).

[81] *Taylor v. State*, 32 A.3d 374, 381 (Del. 2011) (quoting *Strickland*, 466 U.S. at 689).

[82] Affidavit in Response to Ineffective Assistance of Counsel Motion ("Trial Counsel Affidavit") ¶ 2 (D.I. 83).

[83] *Id*.

[84] *State v. Powell*, 2016 WL 3023740, at *25 (Del. Super. Ct. May 24, 2016).

tactical decisions.[85] And an attorney's strategic or tactical choices made after thorough investigation of the relevant law and facts are virtually unchallengeable.[86] Still, the Court must "keep in mind . . . that although strategy satisfies the *Strickland* requirements, '[t]he relevant question is not whether counsel's choices were strategic, but whether they were reasonable.'"[87]

At trial, the State attempted to pin Mr. Calhoun's actions on voluntary intoxication of PCP. Were the State successful, Mr. Calhoun's NGRI defense— indeed any mental health-based defense—was in peril.[88] Trial counsel was rightly concerned with just how much should be explored regarding Mr. Calhoun's PCP use and history. His mother knew of his prior episodes and diagnosis for PCP-induced psychosis. She knew of physical violence toward her that had been tied to his PCP use. And trial counsel knew of her own expert's diagnoses that included, among other things, "History of PCP-Induced Psychotic Disorder; PCP Use Disorder, severe, in remission, in a controlled environment."[89] So trial counsel made a tactical

---

[85] *Outten v. State*, 720 A.2d 547, 557 (Del. 1998) ("[H]ow to cross-examine those [witnesses] who are called are tactical decisions.").

[86] *Green*, 238 A.3d at 174.

[87] *Id.* (quoting *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000)).

[88] *See* DEL. CODE ANN. tit. 11, § 401(c) (2017) ("It shall not be a defense under this section if the alleged insanity or mental illness was proximately caused by the voluntary ingestion, inhalation or injection of intoxicating liquor, any drug or other mentally debilitating substance, or any combination thereof.").

[89] Thompson Report at 6.

decision not to cross-examine Ms. Berry in further detail because Ms. Berry's extensive knowledge of Mr. Calhoun's PCP abuse may have led to more damaging testimony itself or opened her to redirect examination that counsel sought to avoid.

That was, no doubt, reasonable trial strategy.

## B. FAILURE TO CALL MR. CALHOUN'S GIRLFRIEND OR ENGAGE A TOXICOLOGIST WAS INFORMED AND REASONABLE.

Next, Mr. Calhoun argues that trial counsel's failure to call two witnesses constitutes ineffective assistance of counsel.[90]  First, Mr. Calhoun says that trial counsel should have presented Brittney Hannah as a defense witness.[91]  According to Mr. Calhoun, Brittney Hannah would have testified about his "delusional state leading up to the stabbing" and how his behavior "was not consistent with intoxication but was something altogether different."[92]  Mr. Calhoun says Ms. Hannah also could have testified about a 2016 incident that, in his view, demonstrated a prolonged mental illness unrelated to PCP.[93]

Again, "[t]he decision of a trial attorney to call or not to call potential witnesses is a part of trial strategy."[94]  Per trial counsel's affidavit, Ms. Hannah's

---

[90]  Am. Mot. for Postconviction Relief at 47-55, 55-62.

[91]  *Id*. at 47-55.

[92]  *Id*. at 50, 51.

[93]  *Id*. at 53.

[94]  *Sierra v. State*, 242 A.3d 563, 573-74 (Del. 2020) (quoting *Baynum v. State*, 1990 WL 1098720, at *1 (Del. Super. Ct. June 8, 1990)).

testimony might have been less favorable to Mr. Calhoun than current counsel suggests.[95] Ms. Hannah was "aware that he had been a long-time and heavy PCP user who had been hospitalized previously with PCP-induced psychosis."[96] Trial counsel's investigation revealed that Ms. Hannah would have testified about Mr. Calhoun's "bad PCP trips in the past" and that Mr. Calhoun's "behavior was becoming more concerning with each subsequent PCP use."[97] Such testimony would have been inapposite of trial counsel's defense strategy, so the decision not to present it was reasonable.[98]

Second, Mr. Calhoun insists trial counsel's failure to engage and call a defense toxicologist was a misstep.[99] Mr. Calhoun reports his now-employed toxicologist reviewed the State lab's litigation packet and concluded that the lab results produced were, in his opinion, "inconsistent with Mr. Calhoun's statement[s]" about his pre-crime drug usage.[100] In Mr. Calhoun's view, this would have proved that "[Mr. Calhoun's] actions were related to mental illness and were not proximately

---

[95] Trial Counsel Affidavit ¶ 4.

[96] *Id.*

[97] *Id.*

[98] *Outten*, 720 A.2d at 557 ("Whether to call a witness . . . [is a] tactical decision."); *Sierra*, 242 A.3d at 574 ("The decision not to call a witness who defense counsel believes . . . will not help establish a viable defense is not objectively unreasonable.").

[99] Am. Mot. for Postconviction Relief at 55-62.

[100] *Id.* at 57.

caused by drug use."[101] Says Mr. Calhoun, trial counsel's failure to further investigate whether his post-crime comments about his drug use were supported by additional toxicological evidence was unreasonable.[102]

Not so. Trial counsel had familiarized herself fully with the State's toxicology evidence and meant to exploit it and adduce her defense-favorable information via cross-examination. In turn, she decided to "not call a[nother] toxicologist as a witness because such a witness would [also had to] have described how all the symptoms exhibited by Defendant at or near the time of his arrest were entirely consistent with someone who was using PCP or someone who *had* been using PCP over the course of 15+ years."[103] That is was a rational tactical decision. And trial counsel's preparation and trial conduct can't be deemed inadequate "merely because the defendant has now secured the testimony of a more favorable . . . expert."[104]

What's more, given the GBMI verdict, it is clear that the Court had discounted the effect of any possible PCP use and its causal effect on Mr. Calhoun's behavior at the time of the crimes.[105] In other words, there is no reasonable probability that

---

[101] *Id.*

[102] *Id.*

[103] Trial Counsel Affidavit ¶ 5 (emphasis in original).

[104] *Taylor,* 32 A.3d at 384 (quoting *State v. Taylor,* 2010 WL 3511272, at *20 (Del. Super. Ct. Aug. 6, 2010)). As well, given what the now-acquired expert has opined, the information added is only slightly more favorable—*i.e.,* it is, at best, some further confirmation that Mr. Calhoun more likely had not used "Wet" just before the Easter night stabbings.

[105] *See* DEL. CODE ANN. tit. 11, § 401(c) (2017) ("It shall not be a defense under this section if the alleged insanity or mental illness was proximately caused by the voluntary ingestion, inhalation or

-20-

the Court's verdict would have differed with the addition of this toxicology expert.

## C. TRIAL COUNSEL'S PREPARATION OF DR. THOMPSON WAS NOT DEFICIENT.

Finally, Mr. Calhoun calls out trial counsel's preparation of Dr. Thompson as wanting. In support, Mr. Calhoun says that trial counsel failed to: (i) insist that Dr. Thompson incorporate Ms. Berry's statements to police into his report and testimony;[106] (ii) insist that Dr. Thompson incorporate Brittney Hannah's statements into his report and testimony;[107] (iii) provide Dr. Thompson with more extensive DOC records;[108] and, (iv) provide Dr. Thompson with certain police reports.[109]

Contrary to Mr. Calhoun's contentions, trial counsel's preparation of Dr. Thompson was not deficient or unreasonable. True, Dr. Thompson never received the full set of police reports, or the statements by Ms. Berry and Brittney Hannah until a month before trial. But Dr. Thompson was given multiple opportunities—both before and during trial—to incorporate Ms. Berry and

---

injection of intoxicating liquor, any drug or other mentally debilitating substance, or any combination thereof.").

[106] Am. Mot. for Postconviction Relief at 43-45 (identifying omitted statements by Ms. Berry about: (1) Mr. Calhoun's belief that Brittney Hannah was a threat to him; (2) Mr. Calhoun's fear that his family was at risk; (3) Mr. Calhoun's purported hallucinations after the stabbing; and, (4) Mr. Calhoun saying to Ms. Berry just after the stabbing, "Mom, we okay now. We - we gonna be a'right. We gonna be in heaven. We gonna be a'right.").

[107] *Id*. at 52-54 (identifying omitted statements by Brittney Hannah about: (1) Mr. Calhoun's paranoia about his own safety; (2) Mr. Calhoun's fear of Brittney Hannah's incarcerated ex-boyfriend; (3) the bus incident; and, (4) Mr. Calhoun's physical state the morning before the stabbing occurred).

[108] *Id*. at 62-68.

[109] *Id*. at 68-73.

Ms. Hannah's statements into his report, opinion, and, most importantly, his testimony.

Dr. Thompson told the Court at trial that he did rely on summaries of witness statements when drafting his report. And many specific witness statements *were* included in the report—while others were and are entirely duplicative of what Dr. Thompson already reported, testified to, or the Court received via other witnesses and documents. Dr. Thompson himself disclosed—then and now—that the diagnoses and conclusions in his expert report would not have changed even if the statements in question were provided.[110]

Lastly, trial counsel explained that "Dr. Thompson was provided with DOC records that were current as of the time he authored his report."[111] Review of the records generated thereafter does little but buttress the conclusions already presented—that Mr. Calhoun's psychotic episode was less likely the result of PCP use. So, Mr. Calhoun's assertions about the inadequacy of Dr. Thompson's preparation by counsel are unpersuasive.

### D. MR. CALHOUN HAS NOT SHOWN THE REQUIRED PREJUDICE HERE.

"It is not the role of the Court to determine what the best lawyers would have done or even what most good lawyers would have done. Instead, the Court must

---

[110] Sept. 26, 2019 Trial Tr. at 141-144.

[111] Trial Counsel Affidavit ¶ 6.

determine whether trial counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."[112] By this measure, Mr. Calhoun has failed to satisfy *Strickland*'s counsel-deficiency showing. And while that itself is enough to doom Mr. Calhoun's ineffective assistance claim, he also cannot satisfy *Strickland*'s prejudice requirement.

Even if any or all the above-listed actions by trial counsel did fall below the *Strickland* line of objectively reasonable conduct—they do not—Mr. Calhoun still would not meet the second requirement of his ineffective counsel claim. He must show a reasonable probability that trial counsel's conduct caused a different negative outcome than would otherwise have been reached at trial.[113] "[N]ot every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding."[114] Instead, the postconviction movant "must make specific allegations of actual prejudice and substantiate them."[115] Under *Strickland* and its progeny, "if the court finds that there is no possibility of prejudice even if a defendant's allegations regarding counsel's representation were true, the court may dispose of the claim on this basis alone."[116]

---

[112] *State v. Peters*, 283 A.3d 668, 686 (Del. Super. Ct. 2022) (cleaned up), *aff'd*, 299 A.3d 1 (Del. 2023); *Hoskins v. State*, 102 A.3d 724, 730 (Del. 2014).

[113] *Strickland*, 466 U.S. at 694; *Flamer v. State*, 585 A.2d 736, 753 (Del. 1990).

[114] *Sierra*, 242 A.3d at 572 (quoting *Strickland*, 466 U.S. at 693).

[115] *Id*. (quoting *Outten*, 720 A.2d at 552).

[116] *State v. Manley*, 2014 WL 2621317, at *7 (Del. Super. Ct. May 29, 2014).

-23-

Here, Mr. Calhoun cannot demonstrate the requisite prejudice from what he's labeled as lacking performance by trial counsel. Simply put, here Mr. Calhoun has not shown "there is a reasonable probability that, but for counsel's [supposed] unprofessional errors, the result of [his trial] would have been different."[117]

Recall, that Mr. Calhoun sought an NGRI verdict. That meant he had the burden of "establishing the affirmative defense" "that, at the time of the conduct charged, as a result of mental illness or serious mental disorder, [he] lacked substantial capacity to appreciate the wrongfulness of [his] conduct."[118] At bottom, his key contention—and that of Dr. Thompson's declaration—is that the now-added information "would have substantially enhanced [Dr. Thompson's] opinion."[119]

This Court has previously observed that "[t]he law recognizes a distinction between 'insanity' and 'mental illness.'"[120] And the Delaware Supreme Court has explained the role of mental illness in assessing criminal culpability:

> Insanity is a legal concept that comprises a narrow class of symptoms; mental illness is a medical concept that embraces a wide range of diseases. Thus, while both mild neuroses and debilitating psychoses may be included under the heading of mental illness, legal insanity exists only if the defendant's illness undermines his culpability to such an extent that punishment becomes inappropriate. In a psychiatrist's eyes, a person may be

---

[117] *Starling v. State*, 130 A.3d 316, 325 (Del. 2015) (quoting *Strickland*, 466 U.S. at 694).

[118] DEL. CODE ANN. tit. 11, § 401(c) (2017).

[119] PCR Appendix at A-028.

[120] *State v. Wallace*, 2007 WL 545563, at 11 (Del. Super. Ct. Jan. 26, 2007).

-24-

ill in varying degrees, but in the law's eyes, he is either sane or insane, either blameworthy or not blameworthy.[121]

As this Court has instructed in such cases:

> The crux of the insanity test is whether a mental illness or defect has "deprive[d] the defendant of the ability to know that he is committing a wrongful act." The use of terms like "capacity" and "ability" suggest that the question is not whether the defendant appreciated at the moment he committed a criminal act that the act was wrong, but rather whether he had the "capacity" or "ability" to do so if he had reflected on his conduct immediately prior to acting. In other words, the fact that someone acts intentionally but without thinking of the wrongfulness of his conduct, or acts out of uncontrolled impulse without a second thought, does not necessarily mean that the person "lacked the substantial capacity to appreciate the wrongfulness of [his] conduct."[122]

And no doubt, whether one lacked the substantial capacity to appreciate the wrongfulness of his conduct is a finding of fact the defendant must attain.[123] It is against this legal backdrop that the Court evaluated Mr. Calhoun's conduct at the time he killed Andrew Moore and stabbed and sliced three others.

The Court found Mr. Calhoun was guilty but mentally ill.[124] So,

---

[121] *Sanders v. State*, 585 A.2d 117, 123 (Del. 1990).

[122] *Wallace*, 2007 WL 545563, at *11 (internal citations omitted).

[123] *See* DEL. CODE ANN. tit. 11, § 401(a) (2017) ("If the defendant prevails in establishing the affirmative defense provided in this subsection, *the trier of fact* shall return a verdict of 'not guilty by reason of insanity.'").

[124] That is the Court determined "at the time of the conduct charged, [Mr. Calhoun] suffered from a mental illness or serious mental disorder which substantially disturbed [his] thinking, feeling or behavior and/or that such mental illness or serious mental disorder left [him] with insufficient will power to choose whether [he] would do the act or refrain from doing it." *Id*. at § 401(b). *See Aizupitis v. State,* 699 A.2d 1092, 1095-98 (Del. 1997) (explaining GBMI under Delaware law).

Mr. Calhoun's only available prejudice argument is that trial counsel's alleged deficiencies caused Mr. Calhoun to be found guilty but mentally ill instead of not guilty by reason of insanity.

As his main support, Mr. Calhoun relies on Dr. Thompson's recent declaration. There, Dr. Thompson says that if he had been provided with and included greater detail of certain witness statements or other evidence, it "would have supported and strengthened [his] conclusion that Mr. Calhoun was not guilty by reason of insanity."[125]  But that's it.  Even if Dr. Thompson had been provided with all witness statements, police reports, and records, his final diagnoses and conclusion would remain the same.  And Mr. Calhoun's suggestion that had Dr. Thompson given his now-incrementally-enhanced opinion at trial he might have been found NGRI comes nowhere close to the reasonable probability *Strickland* requires.[126]

## E.  THE CUMULATIVE PREJUDICE CLAIM FAILS.

Lastly, Mr. Calhoun contends that the effect of trial counsel's purported errors so undermined the verdict that his constitutional right to due process was denied.[127]

---

[125]  PCR Appendix at A-021-22.

[126]  *Harrington v. Richter*, 562 U.S. 86, 112 (2011) ("The likelihood of a different result must be substantial, not just conceivable." (citing *Strickland*, 466 U.S. at 693)); *Starling*, 130 A.3d at 325 (same); *Baynum v. State*, 211 A.3d 1075, 1084 (Del. 2019) (*Strickland*-level prejudice requires that there is "a substantial likelihood—*i.e.*, a meaningful chance—that a different outcome would have occurred but for counsel's deficient performance.").

[127]  Am. Mot. for Postconviction Relief at 73-75.

But, this cumulative prejudice argument gains no more traction than the others did severally. More directly, because Mr. Calhoun has failed on each count to prove that his trial counsel was *Strickland*-level deficient[128] and that, but for trial counsel's performance, the outcome of his trial would have been different, he fails in the aggregate.

Our Supreme Court addressed a similar cumulative effect argument in *Hoskins v. State*.[129] There, the high court engaged a plain error standard of review and looked for "material defects which are apparent on the face of the record; which are basic, serious and fundamental in their character, and which clearly deprive an accused of a substantial right, or which clearly show manifest injustice."[130] Under this analysis, the Court noted that "none of [the postconviction movant's] individual claims of ineffective assistance have merit because of a failure to show prejudice," and, consequently, found the movant's "claim of cumulative error [to be] without merit."[131] As just explained, the most favorable gloss on Mr. Calhoun's several complaints is that Dr. Thompson's diagnoses and opinion would have been the same

---

[128] The Court knows that "it is important to remain cognizant that [trial counsel's] performance, *viewed as a whole*, is what matters" under *Strickland*." *Green*, 238 A.3d at 174 (quoting *Atkins v. Zenk*, 667 F.3d 939, 945 (7th Cir. 2012) (emphasis in the original)). And so, the Court has looked at the failures alleged both individually and as whole. In this particular circumstance, they do by and large collapse into one complaint of error—presentation of almost immeasurably diminished trial testimony from the defendant's mental health expert.

[129] 102 A.3d 724 (Del. 2014).

[130] *Id.* (citation omitted).

[131] *Id.*

but the support for such, in the psychologist's view, would have been stronger. Yet, even with this added information and Dr. Thompson's declaration as to its effect on his opinion, Mr. Calhoun has still failed to establish "a substantial likelihood—*i.e.*, a meaningful chance"[132] that this Court would have delivered an NGRI rather than a GBMI verdict.[133]

## F. NO NEED FOR FURTHER DISCOVERY OR AN EVIDENTIARY HEARING

The Court can't discern that there is anything "discoverable under [the applicable] good cause standard because [Mr. Calhoun] has shown no compelling reason for [any further] discovery."[134] Indeed, Mr. Calhoun hasn't identified the subject or scope of any "discovery" needed at this point. So, his perfunctory request for such is denied.

Finally, Mr. Calhoun requests an evidentiary hearing.[135] Under Rule 61, this

---

[132] *Baynum*, 211 A.3d at 1084; *Starling*, 130 A.3d at 325 ("The likelihood of a different result must be substantial not just conceivable.").

[133] *See Neal v. State,* 80 A.3d 935, 942 (Del. 2013) ("*Strickland* requires more than a showing merely that the [attorney's] conduct could have, or might have, or it is possible that it would have led to a different result.") (cleaned up); *Ploof*, 75 A.3d at 826-28 (additional evidence or testimony proffered on postconviction that the Court finds "may have helped [movant's] defense marginally," "does not measurably alter th[e factfinder's] analysis" of a defense claim at trial, that "would have made only a negligible difference," or "would not have measurably altered the balance of the evidence" at trial, is not enough to establish prejudice under *Strickland*).

[134] *Dawson,* 673 A.2d at 1197-98.

[135] *See* DEL. SUPER. CT. CRIM. R. 61(h)(1) (providing the Court, after reviewing the record developed in the postconviction proceedings, "shall determine whether an evidentiary hearing is desirable.").

"Court has discretion to determine whether to hold an evidentiary hearing."[136] And where it is apparent on the face of a postconviction motion, the responses thereto, the record of prior proceedings, and any added materials, that a petitioner is not entitled to relief, there is no need for an evidentiary hearing.[137] After consideration of the complete evidentiary record and the single legal issue raised, Mr. Calhoun's request for an evidentiary hearing is denied.

## V. CONCLUSION

Mr. Calhoun has proved neither the deficient performance by counsel nor the prejudice required for postconviction relief to be granted. His trial counsel made reasonable strategic decisions about whom to call, the required preparation, and how to cross-examine. And when considering the totality of the evidence presented at trial and in this proceeding, Mr. Calhoun has not proven there is a substantial likelihood that the Court would have returned an NGRI verdict but for the relatively minute differences he now suggests should have been made in the presentation of his insanity defense. Accordingly, Mr. Calhoun's Rule 61 postconviction relief motion is **DENIED**.

**IT IS SO ORDERED.**

_____
Paul R. Wallace, Judge

---

[136] *Johnson v. State*, 2015 WL 8528889, at *4 (Del. Dec. 10, 2015).

[137] *Id.*; *Hawkins v. State*, 2003 WL 22957025, at *1 (Del. Dec. 10, 2003).